TALBOT et al. v. FEAR et al.

(Circuit Court of Appeals, Seventh Circuit. July 26, 1898.)

No. 485.

1. PATENTS—INVENTION.

After a machine had been constructed to cut veneering three-sixteenths of an inch thick, there was no invention in changing its set or gauge so as to cut veneering one-half inch thick. Nor was there any invention in making packing boxes of thick veneering so produced.

2. SAME—SHIPPING BOXES.

The Thompson patent, No. 450,435, for a shipping case or box, the ends and sides of which consist of a single thickness of "lumber readjusted as to its fiber" (veneering), is void for want of invention as to all its three claims.

Appeal from the Circuit Court of the United States for the District of Indiana.

This was a suit in equity by Frank M. Talbot and Evert M. Thompson against James H. Fear, Oliver P. Campbell, and Henry H. Thomas, for alleged infringement of a patent. In the circuit court the bill was dismissed after a hearing on the merits, and the complainants have appealed.

Jos. A. Minturn, for appellants.
Linton A. Cox, for appellees.

Before WOODS and SHOWALTER, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. The bill in this case is brought for an injunction and damages for infringement of letters patent No. 450,435, issued to Evert M. Thompson on April 14, 1891. There are three claims set forth in the patent, as follows: (1) A shipping case or box, the ends of which each consist of a single thickness of lumber readjusted as to its fiber so that one face is less compact than the normal condition of the wood, and less dense than the other face, and the box sides having a single thickness of similarly readjusted lumber, less in thickness, and having less difference between the density of its faces than the end pieces, said side pieces held to the end pieces by nails, substantially as described. (2) A shipping case or box, the ends of which consist of a single thickness of lumber readjusted as to its fiber so that one face is less compact than the normal condition of the wood, and less dense than the other face, and box sides which are composed of similar readjusted lumber, the compact faces of all the readjusted lumber being in the same direction with reference to the interior of the box, and all secured together by nails, substantially as described. (3) A shipping case or box, the ends of which are composed of lumber readjusted as to its fiber so that one surface is less dense than the normal wood, and less dense than the other face, and side pieces of similar readjusted lumber, the denser faces of all the readjusted lumber being inward, substantially as described. It cannot be said to be very clear what the invention claimed by complainants is. Apparently, the evidence was taken and the case tried in the court below, and a decision rendered, upon the theory that the claim of complainants was for an alleged new article of manufacture, designated as "readjusted lumber." On this appeal this claim is distinctly repudiated by plaintiffs' counsel, for he says in his brief that "the patent sued on in this case is for a new article of manufacture, and that new article of manufacture is a box, and not a new kind of lumber or a new machine." And again he says, "The new product to be considered in this case is a shipping box, and not a new kind of lumber or a new machine." If this had been the claim made on the trial, it seems very singular that the court should have made no mention of it in his decision of the case dismissing the bill. The court, by Judge Baker, gives several reasons for holding the patent invalid; and it may be well to quote the memorandum of the opinion in full, given by complainants in their brief, as follows:

"In view of the prior state of the art, in my opinion, there was no invention in cutting thicker sheets of lumber than had been previously cut.

The lumber, except in increased thickness, is identically the same as the common veneer. The fact that the complainant first produced lumber of sufficient thickness to form the ends of egg cases simply shows that he was the first to discover that an old machine could be used to cut thicker lumber than had been heretofore produced. It was simply carrying a well-known process a step in advance. The advanced step involved the invention of no new mechanism, nor does it produce any new article of manufacture, because the so-called new 'readjusted lumber' differs in no essential respect from common veneers. And, if the production of the thicker sheets of readjusted lumber constituted invention, I still think the patent insufficient to secure it. The method of producing the readjusted lumber is not sufficiently described; and, besides, there is no means pointed out whereby the readjusted lumber may be differentiated from ordinary veneers. The claims are broad enough to cover common veneers. The bill will be dismissed for want of equity, at complainants' costs."

This opinion is fully borne out by the testimony. Another reason which might also have been given for not allowing the invention as a claim for a new kind of lumber is that the complainants were fairly anticipated three years by others in the production of thick veneering, or "readjusted lumber," as it is called in complainants' patent. The evidence shows that veneering from three-eighths to five-eighths of an inch in thickness was made in the summer of 1888, before the plaintiffs' patent issued. Veneering for the making of all kinds of boxes for the shipping of eggs, bananas, oranges, lemons, berries, celery and vegetables, harnesses, etc., had been manufactured and in common use for more than 20 years previous to complainants' patent. But until three years before, in 1888, it had been cut thin (that is to say, from one-eighth to three-sixteenths of an inch in thickness), and employed to form the sides of boxes used for all these various purposes of shipping; the side pieces being nailed to thicker lumber, constituting the ends made by the usual process of sawing. And even now, or at the time the evidence was taken, very many manufacturers refused to use veneering for the end pieces, for the reason that sawed lumber was stronger and better, and was not so likely to split in nailing, and that it could be made at about the same cost, because refuse lumber could be used in sawing, while the veneering, or lumber pared from the circumference of a log by a rotary knife, to be of any value, had to be cut from a fairly-good quality of timber. But the curious thing about this case is that, if this claim for the manufacture of a common box from readjusted lumber was made and litigated in the court below, no mention of it should have been made by the court in its decision. But, however that may be, this court is inclined to agree with the counsel for complainants that the claim for the manufacture of a new kind of lumber is not covered by either of the three claims of the patent, by any fair construction. Still, if the claims were fairly capable of such a construction, it might be well supposed that such a view of the patent would be more favorable to the plaintiffs' claim for infringement than the one he is now putting forth, of making a box from veneering,—a kind of lumber that has been in common use for a quarter of a century. To state a proposition claiming a monopoly for the manufacture of such a box is its own best refutation. If it required no invention, after a machine had been constructed to cut veneering three-sixteenths of an inch in thickness, to

change the set or gauge of the machine so as to cut the veneering one-half inch thick, it required quite as little, after the lumber was made and put upon the market, to make a box of it. Until the advent of complainants' patent, and even since, no one except the complainants had thought it of any utility to turn the compressed sides of the lumber either in or out, but the lumber was made up without any reference to that conception. The evidence shows that the defendants have been engaged in the manufacture of egg boxes made of veneering, but they have paid no attention whatever to the matter of turning the sides of the lumber in any particular way. And, indeed, if the claims of the patent are valid, the making of these boxes would constitute an infringement of the plaintiffs' monopoly, no matter how made. The first claim seems to be for a box, the ends of which consist of a single thickness of readjusted lumber, with the sides of similar lumber, but less in thickness than the ends, with the side pieces held to the end pieces by nails. Under this claim there is no requirement that the lumber shall be of any particular thickness, or that the compact sides should be turned in any particular way. Any making of a box from any kind of veneering, if there were a difference in thickness between the sides and the ends, would violate the patent. And, of course, as the ends must be made thicker in order to hold the nails, the chance for making a box with assurance of exemption from punishment would be small indeed.

Under the second claim the compact faces of the lumber must be all turned one way. They may be all turned either out or in, but must be all one way, which is not essential under the first claim. Under the third claim the denser surface of all the lumber—both end pieces and side pieces—must be turned in. It will be noticed that there is no requirement in either of these claims as to the thickness of the lumber. The infringement would be just as inevitable in case none of the lumber was thicker than the common veneering that has been cut and in common use by all manufacturers of boxes since 1871, as to which the plaintiffs have made no claim to be the inventors, and which they found in the market when they entered into the box-making business, as though the end pieces were made of thick veneering, —say one-half inch,—in reference to which it has been supposed the complainants had made a claim for being the first to manufacture. So it seems clear that, if the patent is valid as for the manufacture of a shipping case or box, there is no escape from a charge of infringement if one would make a box at all of "readjusted lumber," which, in common parlance, is simply veneering cut with a knife instead of being cut with some one of the many kinds of saws used in sawmills. The machine which manufactures readjusted lumber is an ingenious one. If exceeded at all in ingenuity, it must be by the theory of utility put forth by complainants for the manufacture of boxes from the product of the machine. But it must be said that very serious inroads have been made upon this claim for utility by the evidence for the defendants. The evidence shows that readjusted lumber is made by cutting from the surface of a revolving section of a log, and then flattening out the sheet so cut, and holding it in a flattened position until seasoned. To insure the best results, the log is cut into short sec-

tions, two or three feet long, and then dipped into hot water to toughen the fiber, to prevent splitting as the sheet comes from the knife. Then the log is put in the machine, and made to revolve against the adjusted knife, which pares the log into ribbons of wood, something after the manner of an old-fashioned apple-paring machine, except that the log is made to revolve until mainly cut up. One of the principal features in the manufacture is the operation of the pressure bar, which is an iron running lengthwise of the wood while in revolution. It is placed on the outside of the veneer that is being cut,—just opposite to, and parallel with, the knife. It is held against the face of the log with set screws at very great pressure, and serves to compress the wood in cutting so that a half-inch in thickness of the log in its natural state is compressed fully one-sixteenth of an inch. The witnesses do not agree as to just where this compression takes place—whether it extends clear through the wood that runs between the knife and the pressure bar, or is confined to the outside, which is immediately under the pressure bar. While we do not deem the question of importance in the decision of this case, it would seem as though the argument were much upon the side of those who maintain that the compression extends clear through the three-eighths or one-half inch of timber lying between the pressure bar and the knife, because, though the pressure is applied directly by means of the pressure bar from the outside, it is clear that the steel knife which lies under the veneer sheet is pressing with something like the same force on the underside. Otherwise the pressure would have no effect in compressing the wood. But the weight of evidence seems to be that, while all parts of the veneering piece are compressed, the side next the pressure bar gets the greater share. So that the outside, which would be naturally the least firm and compact, as being further from the heart of the tree, becomes more compact than the inside. Of course, in very thin sheets this difference would be very small, while in one-half inch sheets it might be more considerable. Some of the witnesses say they do not know; it is mainly a matter of theory,—as very likely it is. But when we come to the question of utilizing this supposed difference in the degree of compactness of thin sheets of wood in the manufacture of boxes, the matter becomes more and more an abstraction, and of little or no practical value, as we think the evidence clearly shows. The plaintiffs' claim is something like this: Shipping boxes are liable to be exposed to moisture in shipping, especially while in cold storage. This moisture may be more on the outside, or more on the inside. If more on the inside, then the denser side of the board should be put outside, to resist the swelling of the inside from moisture; and vice versa. So that in either case the warping tendency of the wood is thwarted and neutralized, and the box kept straight; and that, while other manufacturers of boxes depend upon the nails to keep the boards from warping, those who manufacture under the plaintiffs' patent can rely upon the boxes keeping straight that are made from readjusted lumber, with the compact side turned all one way. But the testimony shows beyond question that there can be no appreciable difference between the inside and outside of egg boxes and other similar boxes, as regards the tendency to spring or warp from moisture,

as the boxes are made open, so that the air circulates with freedom throughout,—inside as well as outside. And then, when made and put upon the market in car loads, as they are, who is to know, and how are the purchasers to find out, whether the lumber in the boxes has the lesser or more compact side turned in or out? The evidence shows that neither purchasers nor manufacturers think of this matter, or pay any attention to it, and that by far the best lumber for boxes is quarter-sawed lumber (that is, lumber sawed at right angles, or approximately so, with the layers of growth); that it is stronger, and less liable to warp, as we all know from common experience. Veneering, which is cut parallel, approximately, with the rings of growth, the evidence shows, is most subject to warping of any lumber, but with good nailing of thin sides to half-inch or five-eighths inch ends a very good and cheap box can be made from it. If a patent could be maintained upon a box made from veneering, after the claims of the patent in suit, there is no reason that could be given why one could not be maintained for a box made of common lumber sawed from the sides of a log, because the tendency to spring in a certain direction, the edges always away from the heart of a log, which is firmest, is just as certain and inevitable as so-called "readjusted lumber" is to warp in a contrary direction. As the evidence shows, there is always some quarter-sawed lumber coming from every log, as a result of the common method of sawing, where the log is squared by taking slabs and boards from four sides, and then sawing the remaining block into boards. But, just as soon as you get either way from the heart of the log, the boards, unless confined in place by piling, will warp, by the middle of the board bulging towards what was the heart of the tree, and the edges in the contrary direction. It is quite evident to the court, from the testimony, that there is no substantial merit in either of the claims of the patent, either upon the score of invention or that of utility. The decree of the circuit court is affirmed, with costs.